In re Kim A. MARTIN, Debtor.

Bankruptcy No. 97–13397 PHX JMM.

United States Bankruptcy Court, D. Arizona.

Jan. 29, 1999.

438

Randy Nussbaum, Phoenix, AZ, for debtor.

Gregory G. McGill, Scottsdale, AZ, for R. Highsmith/creditor.

Russell A. Brown, Phoenix, AZ, Chapter 13 Trustee.

### MEMORANDUM DECISION RE: (1) CONFIRMATION AND (2) AMOUNT OF HIGHSMITH CLAIM

JAMES M. MARLAR, Bankruptcy Judge.

On March 11, September 16, October 14 and November 13, 1998, this court heard testimony and considered evidence concerning whether a chapter 13 consumer debtor should have her plan confirmed. The objecting party is unsecured creditor Robert Highsmith. The Internal Revenue Service also filed an Objection, but did not appear. The court also considered the type and amount of the Highsmith claim.

After reviewing the evidence, the file and the law, this court now enters its decision and reasons therefor. The debtor was represented by Randy Nussbaum; Mr. Highsmith was represented by Gregory G. McGill.

### *JURISDICTION*

Robert Highsmith has objected to confirmation of an Amended Chapter 13 Plan. This is a "core" proceeding. 28 U.S.C. § 157(b)(2)(L). This court has jurisdiction pursuant to 28 U.S.C. §§ 157; 1334. Determination of claims is also a "core" proceeding. 28 U.S.C. § 157(b)(2)(B).

### *PROCEDURAL HISTORY*

The debtor filed a chapter 13 petition on October 1, 1997. She initially proposed a 60–month plan at $750 per month. Ms. Martin is a commissioned real estate salesperson. On July 28, 1998, the debtor filed an Amended Plan (Dkt. 39), and both the IRS and Highsmith filed Objections (Dkt. 47, 51). The Trustee also filed a recommendation (Dkt. 48). The court assumes that once the objection of Highsmith is resolved, the debtor can work out any remaining issues with the Trustee and the IRS. On July 30, 1998, Mr. Highsmith also asked that the objection to his claim be consolidated with the hearing on confirmation. (Dkt. 41).

### *THE AMENDED PLAN*

The Amended Plan (Dkt. 39) provides for the debtor to pay $750 per month to the Trustee for 10 months. Thereafter, for 45 months, the debtor will pay $1,000 per month. This would bring $52,500 into the estate. Under the plan, it would be paid out as follows:

| | |
|---|---|
| To Trustee: | $52,500.00 |
| Less: Trustee Fee (7%) | ( 3,675.00) |
| Less: Debtors' atty. fee (est.) | (10,000.00) |
| Less: Priority taxes IRS | (16,077.84) (POC) |
| Less: Secured claim of Hurley State Bank | ( 500.00) |
| Available to unsecured creditors | $22,247.16 |

| | |
|---|---|
| Claims of 9 unsecured creditors [1] | $92,620.45  (POCs) |
| Dividend to unsecured creditors | 24% |

Thus, Mr. Highsmith is proposed to receive, under the plan, approximately $10,-800, which is 24% of his actual claim of $45,000,[2] which does not include his request for $350,000 in punitive damages.

## THE CREDITOR'S OBJECTIONS

### 1. Internal Revenue Service

The IRS has asserted that the plan includes a post-petition liability. While this is a sound objection, it is assumed that the debtor can remedy this defect, and that the IRS will agree to an amendment, or may even accept the treatment. Settlements are routine concerning objections of this nature.

### 2. Robert Highsmith

Robert Highsmith has raised several objections:

1. The plan was not proposed in good faith. 11 U.S.C. § 1325(a)(3);
2. The debtor concealed fraudulent conveyances;
3. Highsmith is a secured creditor of the debtor, but is being treated as an unsecured creditor: this is unfair discrimination. §§ 1322; 1325(a)(5);
4. The debtor is not paying all of her projected disposable income into the plan. § 1325(b)(1)(B);
5. The debtor's schedules failed to list all of her assets, or undervalued them;
6. The debtor incorrectly states her monthly expenses;
7. The case was filed to frustrate collection of a judgment;
8. The "best interests of creditors" test is not met. § 1325(a)(4);
9. The debtor's amendments to her schedules were made in bad faith;
10. There is something suspicious about the debtor's sale of the Becker Lane promissory note to Mr. Park E. Anderson, i.e. a fraudulent conveyance. The value of the Becker Lane note should be included in the liquidation analysis.

## THE LAW

In order to confirm a plan, a debtor must meet certain criteria under § 1325:

(1) The plan must comply with the Bankruptcy Code requirements;
(2) All fees have been paid, and the payments to the trustee are current;
(3) Good faith;
(4) Creditors will receive more under the plan than they would in liquidation;
(5) Any secured claimant must either consent to the treatment under the plan, or secured collateral is surrendered, or they retain their lien until the collateral's value has been paid; and
(6) The plan is feasible.

When an objection is made, the debtor must also commit all net disposable income to the plan. § 1325(b)(1)(B). Against these standards and the evidence presented, the court must determine if this case can be confirmed.

## THE FACTS

### 1. Background

The debtor is a self-employed real estate agent. She earns her living through com-

---

1. Claims of unsecured creditors are:

| | |
|---|---|
| First USA | 9,370.32 |
| Chevy Chase | 7,255.02 |
| Bank One | 6,880.33 |
| Hurley State Bank | 2,518.53 |
| Stoops & Kloberdanz | 1,138.98 |
| Novus | 5,338.69 |
| Robert Highsmith | 45,000.00 |
| Wells Fargo | 2,360.00 |
| Az. Fed. Credit Union | 12,758.58 |
| | $92,620.45 |

2. However, if Highsmith is allowed to participate to the full extent of his $120,000 judgment, his dividend recovery will increase to $15,960, because unsecured creditors' total debt will then increase to $167,620, of which Highsmith will have $120,000. Each creditor will then realize an approximate 13.3% dividend.

missions which she earns on real estate sales. In the summer and fall of 1995, Robert Highsmith and the debtor were both employed at Kaufman and Broad, selling residential property. Eventually, both individuals left Kaufman and Broad, and in mid–1995 decided to work together, sharing their client base, commissions and expenses. No formal enterprise documents were ever drawn up. Each party operated through closely-held corporations. The debtor's corporation was called SunCoast Properties. The business relationship lasted only a relatively short time, and terminated between January and March, 1996. Thus, the duration of their joint activities was approximately 8–9 months.

Eventually, Highsmith brought suit against the debtor, which will be discussed below.

### 2. Bankruptcy

The debtor increasingly experienced financial pressure, in the form of unpaid income taxes, a tax lien, mounting credit card debt, and attorneys' expenses in relation to her dispute with Highsmith. Additionally, her real estate business was not generating the income necessary to cope with these financial pressures. On July 17, 1997, the debtor filed a chapter 7 petition. However, it was dismissed a month later, on August 25, 1997, for failure to file schedules (Case No. 97–9551 PHX CGC).

On October 1, 1997, this chapter 13 case was filed in order to allow the debtor to keep her property, pay her accrued IRS taxes over time, save her residence, and pay her creditors more than they would realize on liquidation.

In the chapter 13 case, the debtor proposes to pay her creditors, from future income, the present value of a non-exempt annuity and certain carryback commissions which existed on her filing date. She proposes to pay $52,500 to the chapter 13 trustee for distribution to creditors, including administrative expenses, taxes, and a small secured debt to Hurley State Bank on her business computer equipment.

The debtor testified that her plan is feasible, because consumer interest in real estate sales has increased due to declining interest rates, although slow sales periods are anticipated through the year. Due to self-marketing, her income has dramatically increased, but so have her business expenses. On an annual basis, she expects to make and pay out:

| | |
|---|---|
| Income:<br>($10,615 per month) | $127,380 |
| Less: Business Expenses<br>($6,317 per month) | ($75,804) |
| Adjusted Gross<br>($4,298 per month) | $ 51,576 |
| Less: Monthly living<br>expenses ($3,298 per month) | ($39,576) |
| Less: Payment to Trustee<br>($1,000 per month) | ($12,000) |
| Amount Left Over | $ –0– |

### Debtor's Business Reports

Since the debtor is self-employed, she is required to file business operating statements, which the trustee and creditors are able to review in order to weigh the feasibility and disposable income requirements of the plan. Here, the debtor did file such reports, which reflected the following:

| Exhibit | Month | Income | Business Expense | Surplus/(Loss) |
|---|---|---|---|---|
| 48 | October 1997 | $ –0– | $ 1,071 | ($1,071) |
| 49 | November 1997 | 3,707 | 586 | 3,120 |
| 50 | December 1997 | 12,104 | 935 | 11,168 |
| 52 | January 1998 | 185 | 1,005 | (820) |
| 51 | February 1998 | 17,844 | 11,475 | 6,369 |
| 53 | March 1998 | 17,141 | 9,984 | 7,156 |
| 54 | April 1998 | 14,817 | 8,768 | 6,048 |

| | | | | |
|---|---|---|---|---|
| 55 | May 1998 | 14,406 | 8,715 | 5,690 |
| 56 | June 1998 | 24,052 | 10,521 | 13,531 |
| 57 | July 1998 | 27,935 | 10,043 | 17,892 |
| 57 | August 1998 | 3,565 | 3,022 | 543 |
| 73 | September 1998 | 8,107 | 10,866 | (2,759) |
| 73 | October 1998 | 3,869 | 4,110 | (241) |
| | | $147,734 | $81,105 | |

For each of the thirteen reported months, the debtor has *averaged*, on *actual* receipts:

| | |
|---|---|
| Income | $11,364 |
| Expenses–Business | (6,239) |
| Net take home | $ 5,125 |
| Personal expenses (Schedule J; Ex. 66) | (3,298) |
| Surplus | $ 1,827 |
| To Trustee | (1,000) |
| SURPLUS | $ 827 |

The debtor's current earnings are significantly better now than in the three previous years, 1995, 1996 and 1997, when she earned adjusted gross incomes of $36,000, $29,805 and $34,860, respectively (Ex. 3, 4, 61).

### The Liquidation Value of the Debtor's Estate— § 1325(a)(4)

When the debtor filed this chapter 13 case, she had certain non-exempt items of property which she valued. A comparison of her real and personal property with her exemptions reveals that the following assets are non-exempt:

| Item | Debtor's Value |
|---|---|
| Safeco Annuity (face value $50,000) | $20,000 |
| Misty Willow Note (face value $12,187) | 3,000 |
| 11th Street Note (face value $2,500) | 500 |
| Janice Way Note (face value $2,500) | 500 |
| Sports equipment | 30 |
| 100 Shares—Sun Coast | –0– |
| S.E.T. stock | unknown |
| | $24,030 |

(Schedules B, C).

The actual exemptions claimed by the debtor are usual and customary, and fit within the intent of the Arizona Statutes. Her home, car and business equipment are liened, and have no value in excess of the statutory exemption. No objection to the exemptions was made by the trustee or any creditor within the 30–day time period following the meeting of creditors, as prescribed by *Bankr.R.* 4003.

Because the debtor is paying more into the plan ($52,500) than her non-exempt assets would bring at liquidation ($24,030), the debtor has satisfied § 1325(a)(4).[3]

### THE HIGHSMITH DISPUTE

#### 1. Background

The Highsmith/Martin dispute arose, in pertinent part, out of a claimed conversion of Highsmith's portion of two earned commissions, on property located at Becker Lane and Misty Willow Streets. A state court lawsuit against the debtor, SunCoast Properties and others was filed in 1996.

3. Even if the debtor's one-half interest in the original Becker Lane note is brought into the equation, the liquidation value would only increase to approximately $33,000.

The Complaint was amended on September 8, 1997. Other causes of action besides the conversion of the two commissions were also involved.

After Martin filed chapter 13, and the action against her was stayed by 11 U.S.C. § 362(a), Highsmith obtained a default judgment against SunCoast Properties for $40,000, which the court trebled under RICO theories to $120,000. This judgment was signed on May 8, 1998 (Dkt. 47). Highsmith has filed a proof of claim, here, for $45,000, plus punitive damages of $350,000.

### 2. Highsmith's Specific Concerns

#### A. The Safeco Annuity

■ Highsmith maintains that a non-exempt annuity, which is payable to the debtor in November of 2000 and 2005, of $25,000 in each year (for a total of $50,000), was undervalued by the debtor.

The details of that asset are these. When the debtor was divorced from her husband in 1990 or 1991, she received a one-half interest in a $140,000 annuity payout from Safeco Life Insurance Company. Payments were to be paid to her as follows:

| November 24, 1990 | $10,000 |
| November 24, 1993 | $10,000 |
| November 24, 2000 | $25,000 |
| November 24, 2005 | $25,000 |

At the time of filing, only the last two, larger payments remained unpaid (Ex. 22). In an attempt to obtain a present value for the future payments, the debtor contacted the Sterling Woodbridge Company for an offer and estimate of value. That company responded on September 11, 1997, that its opinion of value and offer for the future stream of payments on the $50,000 annuity was $20,000 (Ex. A–8, A–9; testimony of Martin). This is the value placed on the debtor's schedules filed October 13, 1997 (Schedule "B," Dkt. 3). This figure did not change when the debtor filed an Amended Schedule "B" on September 25, 1998 (Dkt. 53). Although Highsmith's counsel cross-examined Ms. Martin on this

property, no evidence was submitted to show that the present value, as of the petition date, was anything other than $20,000.

Consequently, the court finds and concludes that the non-exempt value of this asset on the date of filing was $20,000.

#### B. The Becker Lane Note and the Sale to Park Anderson

Robert Highsmith's objection to the debtor's plan folds in a concern about a commission on a transaction referred to by the parties as "The Becker Lane Transaction." The facts about this real estate sale are these.

On May 10, 1995, Mr. and Mrs. Baldounis purchased property located at 10635 E. Becker Lane, Scottsdale, Arizona. All or a portion of the real estate commission was carried back, and a promissory note and deed of trust for $16,224.68 were executed by Mr. and Mrs. Baldounis (Ex. 28, 35, 36). The note bears 8% interest, payable, interest-only, on a monthly basis, until it balloons and the principal becomes due on May 10, 1999 (Ex. 35). The note was made payable to SunCoast Properties, a corporation owned 100% by Kim Martin, the debtor. The deed of trust securing the note was recorded May 13, 1996 (Ex. 28). SunCoast was the beneficiary under the deed of trust.

On April 4, 1997, an Assignment of Beneficial Interest was recorded, transferring the beneficial interest from SunCoast to Park E. Anderson, who was the debtor's boyfriend (Ex. 26). A notice to the collecting title company directed that future payments be made to Mr. Anderson. This notice was executed by SunCoast Properties, Inc. (Ex. 27). Mr. Anderson testified that he paid cash in the total sum of $8,000 to SunCoast on April 1, 1997, and the documentary evidence supports that statement (Ex. J). Mr. Anderson testified that at the time, the debtor was in financial difficulty, and that, while he was willing to financially assist her, he desired to have some security for repayment. The $8,000 amount, paid on April 1, 1997, was deemed

by Anderson and SunCoast to be fair value for a cash flow stream of $1,297 per year until maturity, two years later, of $16,224.68. Mr. Anderson believed that he had no assurance of a continued payout under the note, and that there was a risk associated with a future default. In addition, he knew the note was the subject of litigation, but there was no stay in effect as to SunCoast's ability to deal with the property. However, the chances of eventually having nothing, or only half of the investment, also increased his risk. Finally, Ms. Martin testified that this deed of trust was in third position on the property. This likewise increased the risk of payment.

Ms. Martin testified that she used the $8,000 received on the sale to pay taxes to the IRS of $3,628.42, which SunCoast owed, and to pay $4,000 of SunCoast's legal expenses associated with the Highsmith litigation (Ex. 75, 76).

Mr. Highsmith's concerns are that transfer of this Becker Lane note to Anderson was a fraudulent conveyance for which SunCoast did not receive fair consideration, and that he owned a one-half interest in the Note. This dispute is contained in the Complaint filed in Superior Court.

■ No evidence was presented by Highsmith to show that SunCoast's sale of the Note for $8,000 was unfair, under all of the circumstances surrounding the Note's risk and term of payment. Under all of the facts, the court finds and concludes that a fraudulent conveyance did not occur, and that the sale was for a fair price, at arm's length. Under Highsmith's theory that he owns half of the note, the price paid was 85% of the face value.[4]

■ However, this court will defer to the Superior Court's finding and conclusion that the Becker Lane transaction created a damage to Mr. Highsmith, based on SunCoast's conversion of his one-half interest in the note. Because the Superior Court did not break down its $40,000 Judgment, this court finds on the evidence that half of the payment stream since the Note was executed, and half of the eventual payment, was converted by Martin acting *ultra vires* of SunCoast. Thus, Highsmith's proper claim against this debtor, for the Becker Lane note, is:

Date of Note: May 10, 1995

| | |
|---|---|
| Half of interest payment May 10, 1995–May 10, 1996 | $ 648.98 |
| Half of interest payment May 10, 1996–May 10, 1997 | $ 648.98 |
| Half of interest payment May 10, 1997–May 10, 1998 | $ 648.98 |
| Half of interest payment May 10, 1998–May 10, 1999 | $ 648.98 |
| Half of Balloon Payment Due May 10, 1999 | $ 8,112.34 |
| Actual Damage Claim on the Becker Lane Note | $10,708.26 |

### C. The Misty Willow Note

■ The debtor still holds a promissory note and deed of trust known by the parties as the "Misty Willow Transaction." It, too, was included in Mr. Highsmith's Superior Court litigation, wherein he alleged that SunCoast and Martin converted his one-half interest in the commission carryback obligation. The facts are these.

On February 26, 1996, Bruce and Mary Vinson purchased residential property at 3930 W. Misty Willow, Glendale, Arizona. On that day, in order to secure the sales commission, a promissory note and deed of trust were executed by the Vinsons in favor of SunCoast Properties, Inc. (Ex. 33, 34). The Deed of Trust was recorded on March 1, 1996 (Ex. 34).

The note was for $12,187. Interest accrued at 8% per annum. Monthly payments were $89.42 based on a 30–year

---

4. If Martin or SunCoast owned half of the total, or $9,410.30, then Anderson's $8,000 payment represented 85% of the face value.

amortization. The note balloons on approximately the fifth anniversary, March 28, 2001 (Ex. 33). Grand Canyon Title was the collection entity (Ex. 32, 33).

On July 15, 1997, SunCoast assigned the payments under the note to the debtor, individually (Ex. 30), and on the same day, an Assignment of Beneficial Interest under the deed of trust was likewise executed in favor of Ms. Martin (Ex. 29). Ms. Martin testified that she continues to receive the monthly payments, if and when made by the Vinsons.

However, this property has experienced payment problems. The status of the Misty Willow residence is that it has a value of $110,000. There are three liens against it:

| | |
|---|---|
| Value: | $110,000 |
| Less: 1st Lien | (80,000) |
| Less: 2nd Lien | (7,600) |
| Less: 3rd Lien (carryback) | (12,187) |
| Equity | $ 10,213 |

Because the Vinsons have not been paying all lienholders equally, the debtor testified that she has had to advance money to preserve her position with the senior lienholders. The Vinsons have made no payments since May 1998. The debtor testified that she paid $7,819 to preserve her position. Consequently, this figure must be *added* to her third lien, pursuant to paragraph 4 of the Vinson Deed of Trust (Ex. 34). The possibility of the Vinsons' ultimate payout on this note is in question. The debtor valued the note as being worth only $3,000 in Schedule "B" (Dkt. 54), because of these uncertainties.

Mr. Highsmith's claim to half of this note was also included as a subject of his Superior Court action. As noted above, he received a $40,000 judgment against Sun-Coast, but there was no breakdown for the Misty Willow transaction.

Thus, on the evidence presented, the best claim that Mr. Highsmith would have on this item is calculated by this court as follows:

| | |
|---|---|
| One-half of stream of payments of $89.42 × 60 months | $2,682.60 |
| One-half of matured payout (assuming a $98.08 principal reduction/ per year × 5 years) Payout at maturity = $11,696.60 | $5,848.30 |
| Highsmith's damages for conversion | $8,530.90 |
| Less: Responsibility for one-half of protection expenses paid fully by Martin ($7,819 ÷ 2 = $3,909.50) | (3,909.50) |
| Net Damages | $4,621.40 |

### D. The Highsmith Claim

On July 30, 1998, Robert Highsmith requested that the debtor's objection to his proof of claim be consolidated with his objection to her plan. The court agrees that that suggestion is efficient, and that Mr. Highsmith has had an ample opportunity to present his claim, and that Ms. Martin has had the same opportunity to present her objections. Therefore, the court will liquidate his claim against the debtor's estate here.

Although Mr. Highsmith has maintained that he is a secured creditor, the court finds that he is not. He had no recorded security interest, deed of trust, mortgage or other traditional form of security for an indebtedness. The Bankruptcy Code defines a "security interest" as a "lien created by an agreement." 11 U.S.C. § 101(51). A "lien" is defined as a "charge against or interest in property to secure payment of a debt or performance of an obligation." § 101(37). In determining whether a lien exists, federal bankruptcy courts refer to state law. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Under state law, the Becker Lane or Misty Willow transactions did not create a deed of trust, security interest, mortgage, or contract for sale. There are no written agreements which would create a lien in the traditional sense. In addition, Mr. Highsmith did not have physical possession of the notes. Hence, Highsmith's claim is merely unsecured, and the court so holds.

■ But Highsmith does have an unsecured claim. That claim is measured in part by the May 8, 1998 Superior Court judgment against SunCoast. Highsmith maintains in this case that he was injured by the debtor's conversion of the Becker Lane and Misty Willow Notes, in her capacity as president and sole shareholder of SunCoast. (See, Trial Memorandum, at 2, lines 1–8). As noted above, the damages relative to those two properties, are:

| | |
|---|---|
| Becker Lane: | $10,708.26 |
| Misty Willow: | $ 4,621.40 |
| | $15,329.66 |

If this court then trebles this amount as did the Superior Court, to provide for proportionate punitive damages, the claim would be for $45,988.98. Punitive damages are an appropriate element of a claim. *Cohen v. De La Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).

Under this analysis, Robert Highsmith will be awarded an unsecured claim of *$45,988.98.*

### APPLICATION OF THE LAW AND THE FACTS TO THE OBJECTIONS TO CONFIRMATION

No objection was made by Mr. Highsmith to whether the plan technically complied with chapter 13 law, nor whether monthly payments had been made to the trustee, nor whether secured claims are being appropriately paid (indeed, as an unsecured creditor he lacks standing on this argument), or even feasibility. Therefore, the court is free to make such findings on the record, and does so. The court finds that the debtor's plan satisfies §§ 1325(a)(1), (2), (5) and (6) of the Bankruptcy Code.

At issue in this case are the debtor's good faith, the liquidation analysis and chapter 7 reconciliation, and whether the debtor is submitting all of her projected net disposable income towards the plan. §§ 1325(a)(3), (4) and (b)(1)(B). Each will be discussed in turn.

### Liquidation Analysis—§ 1325(a)(4)

■ This analysis is commonly known as "the best interest of creditors" test. It means that creditors will receive more under a plan than under a liquidation. Here, the value of the debtor's non-exempt assets are $24,030, according to the debtor's schedules. These values were not successfully challenged by the contradictory evidence. Since the debtor intends to pay in $52,500 over the life of the plan, her plan appears to satisfy § 1325(a)(4). On liquidation, the unsecured creditors would only receive:

| | |
|---|---|
| Liquidation Value: | $24,030 |
| *Less:* Trustee fee (11 U.S.C. § 326(a)) | (3,153) |
| *Less:* IRS priority | (16,077) |
| *Less:* Debtor's atty. fee | (1,000) |
| Available for Distribution | $ 3,800 |

There are presently 9 creditors, with total unsecured claims of $93,609.43, which figure includes Mr. Highsmith's now allowed claim of $45,988.98. Under this analysis, each unsecured creditor is projected to receive a 23.76% dividend over the life of the chapter 13 plan. In a chapter 7 liquidation, these creditors would receive only a 4% dividend. Even if one-half of the Becker Lane note, $9,410.30, is added to this column, the dividend on liquidation would only increase to 14.5%. Therefore, § 1325(a)(4) is satisfied.

### Disposable Income—§ 1325(b)(1)(B)

■ Attempting to project a debtor's future disposable income is something far short of an exact science. This effort becomes even more speculative when non-salaried, commissioned salespeople are involved. As the testimony revealed, the income of a real estate salesperson can fluctuate wildly from period to period. While it is true that Ms. Martin has enjoyed higher income over the last year, a comparison to her prior years' tax returns shows that it may not be counted on to remain consistently high. Even at the current level, there is not much of a "cushion" considering its historically short and

most recent one-year income stream. A reasonable cushion is allowable. *In re Marshall,* 111 B.R. 325, 327 (Bankr.Mont. 1990). The analysis of *projected* disposable income required by § 1325(b)(1)(B) does not require precision, but only a best estimate based on realistic possibilities. *See In re Anderson,* 21 F.3d 355 (9th Cir.1994). The debtor's projections for her amended plan are realistic, because good fortune and the long delay in confirming this plan have combined to provide this windfall for her creditors.

There is also a Code provision, contained in § 1329(a), by which the trustee, the debtor or an unsecured creditor can move to modify the plan, and seek either an increase or decrease in payments, based upon changed circumstances in the future. This right exists post-confirmation if the economics change.

Here, however, the debtor has satisfied the statutory requirement to commit her net projected disposable income to the plan. § 1325(b)(1)(B).

### Good Faith—§ 1325(a)(3)

The final argument made by Mr. Highsmith against confirmation falls within the general category of "good faith." The Ninth Circuit Court of Appeals has recognized that this type of challenge implicates the court's consideration of the "totality of circumstances." *In re Goeb,* 675 F.2d 1386 (9th Cir.1982); *See also In re Warren,* 89 B.R. 87 (9th Cir. BAP 1988) (The BAP set forth an 11–point test). In order to fully consider this objection, the court will discuss it in conjunction with each of the *Warren* factors. To properly address Mr. Highsmith's concerns in the context of his objections, the court feels that the *Warren* factors offer a full and complete analysis of the facts of this case.

### Warren Factor No. 1

#### *The amount of the proposed payments and the amounts of the debtor's surplus.*

As noted above, the debtor has committed to a plan which is more ambitious than her historical incomes of 1995–97 would seem to allow. So far, she has performed, and based on her reasons for why the market and her entrepreneurial skills bode for a rosy future, the court believes them to be feasible. This factor is satisfied.

### Warren Factor No. 2

#### *The debtor's employment history, ability to earn, and likelihood of future increases in income.*

This also requires a feasibility analysis. Based on the debtor's current age and experience, it would appear that she has learned how to cast off the mistakes of the past, and focus on those positive attributes of how best to make money in a competitive real estate market. Phoenix and its environs is a fast-growing area, and this debtor appears to be positioned to exploit her attributes and earn the income required to fund the plan. *Warren* Factor No. 2 is satisfied.

### Warren Factor No. 3

#### *The probable or expected duration of the plan.*

The 55–month plan is 5 months short of the maximum time allowed by statute, § 1322(d), and 19 months longer than minimum required. This demonstrates long-term commitment while allowing for a small cushion in the event a temporary moratorium is needed during a dry spell. There is no apparent or proven abuse of this factor, and it is deemed satisfied.

### Warren Factor No. 4

#### *The accuracy of the plan's statements of the debts, expenses and percentage of repayment of unsecured debt, and whether any inaccuracies are an attempt to mislead the court.*

Despite Mr. Highsmith's arguments to the contrary, the court did not perceive that there were glaring errors in either the debtor's initial schedules, nor her amend-

ments. Amendments may be made at any time, and are necessary to insure that a term bankruptcy case remains fluid until confirmation. *See, Bankr.R.* 1009(a). Here, all amendments were voluntary and were not made pursuant to a court order. The amendments which were made favored the creditors and will result in a larger distribution. Unsecured creditors should realize a 24% distribution as opposed to a 4 to 14% liquidation dividend.

The evidence at trial did not reflect any effort to mislead the court or creditors. Therefore, *Warren* Factor No. 4 is satisfied.

### Warren Factor No. 5

### The extent of preferential treatment between classes of creditors.

No preferential treatment was shown. Taxes and administrative expenses are paid first, in accordance with their statutory priorities. § 1332(a)(2). The small $500 secured claim is paid over time, with interest, satisfying § 1325(a)(5). Finally, unsecured creditors share pro-rata, and will receive 24% of their claims. No discrimination among members of the same class exists. § 1322(b)(1). Thus, *Warren* Factor No. 5 is satisfied.

### Warren Factor No. 6

### The extent to which secured claims are modified.

This is a *de minimis* matter. It involved the valuation, under § 506, of only the computer equipment liened by Hurley State Bank. An objection was made by the debtor, and resolved. All other secured debt, on the motor vehicle and the residence, is being paid in accordance with their contracts and remain unmodified. *Warren* Factor No. 6 is thus satisfied.

### Warren Factor No. 7

### The type of debt sought to be discharged, and whether any such debt is nondischargeable in chapter 7.

Merely because a debt may be nondischargeable does not per se prevent either a chapter 13 confirmation or discharge. *Warren,* 89 B.R. at 93; *Street v. Lawson (In re Street),* 55 B.R. 763, 764–65 (9th Cir. BAP 1985). Here, because the claim of Highsmith is fortunate enough to be comprised, by two-thirds, of punitive rather than actual damages, in reality Highsmith is coming out close to whole. The "super-discharge," in the context of this case, combined with the optimistic plan payments, means that justice is being achieved for all parties consistent with the spirit of chapter 13 and the Bankruptcy Code.

Highsmith's *actual* damages on the Becker Lane and Misty Willow transactions were proven to be $15,329.66. Under the plan, he is projected to receive approximately $11,000 (24% of $45,988.88). This is not an altogether bad result. Bad faith may exist where a debtor files a bankruptcy petition only to defeat state court litigation. *In re Eisen,* 14 F.3d 469, 471 (9th Cir.1994). The facts of this case show that Ms. Martin had legitimate reasons for filing the petition, notwithstanding the state court action. She was in financial distress and was being subjected to collection pressures. The totality of evidence reveals that Ms. Martin has complied with the bankruptcy code and rules related to her schedules and statements, and the plan benefits her creditors.

Therefore, the court finds that *Warren* factor No. 7 is satisfied.

### Warren Factor No. 8

### The existence of special circumstances, such as inordinate medical expenses.

The special circumstances here relate exclusively to the debtor's employment as a commissioned real estate salesperson with fluctuating income and expenses. The debtor's plan, if anything, is ambitious in its promises. This favors creditors, not disadvantages them.

*Warren* Factor No. 8 is satisfied.

### Warren Factor No. 9

#### The frequency with which the debtor has sought relief under the Bankruptcy Reform Act.

This is the debtor's second bankruptcy case under the Code. The first, a chapter 7, was dismissed within the first month of filing. Part of the reason, explained at trial, was that chapter 13 accomplished numerous objectives: (1) the debtor did not have to surrender any property; (2) the debtor could arrange to schedule and pay her IRS debt, thereby relieving its lien upon payment; (3) the debtor could avoid litigation with Highsmith, and pay him more on his claim than he would realize in chapter 7; and (4) she could obtain the "super-discharge" on what might have been a non-dischargeable debt to Highsmith of approximately $15,000. While obtaining the superdischarge of § 1328(c) is one of the reasons for filing, the court does not view it as "bad faith" under all the circumstances of this case. See, discussion regarding *Warren* Factor No. 7, above. Consequently, *Warren* Factor No. 9 has been satisfied.

### Warren Factor No. 10

#### The motivation and sincerity of the debtor in seeking chapter 13 relief.

The motivation of the debtor in filing this case has been sincere. The debtor was under severe financial strain. Upon advice of counsel, chapter 13 was viewed as the most optimum chapter within which to achieve financial equilibrium. The debtor's reasons were expressed articulately and credibly at the hearing. Her plan is fair and shows commitment to the purpose of chapter 13. Her motives were not to inflict harm upon her creditors, but rather to pay them as much as she could afford over a 55-month period. Her sacrifice is $52,500. Her creditors are the beneficiaries.

*Warren* Factor No. 10 is satisfied.

### Warren Factor No. 11

#### The burden which the plan's administration would place upon the trustee.

No additional burdens are upon the chapter 13 trustee in this case any more than he experiences in any other case. For administering this routine matter, the trustee will be compensated at 7%, or $3,675. There are relatively few creditors—the IRS, the debtor's attorney, 9 unsecured creditors, and one secured creditor. The trustee will cut between 14–20 checks each month. For this service, the trustee will receive $66.81 per month. No undue burden on the trustee is noted.

*Warren* Factor No. 11 is satisfied.

### RULING

Robert Highsmith's Objections to Confirmation are OVERRULED.

Robert Highsmith's claim is determined to be an unsecured claim of $45,988.98.

The Internal Revenue Service's Objection to Confirmation is *sustained.* However, if this objection is resolved by stipulation, the IRS shall sign off on a form of Order.

Any presentation of a confirmation order shall bear the "approved" signatures of both the chapter 13 trustee and the representative of the Internal Revenue Service or its attorney. Those signatures will signify to the court that their objections and concerns have been resolved and satisfied.

This Memorandum Decision is *not* an appealable Order. It is interlocutory. Any appeal must be taken from the actual Order confirming this plan, and it must be taken within 10 days of its entry on the docket. *Bankr.R.* 8002. Motions for Reconsideration shall not be filed.

The debtor shall present an Order Confirming the Plan within 30 days and serve a copy on the parties set forth below.